IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | | |
| Plaintiff, | | No. 3:08-cv-00069-JAJ |
| vs. | | |
| CHARLES MCKENZIE; KRISTI MCKENZIE a/k/a KRISTI FLEETWOOD, as trustee of, MCKENZIE FAMILY REVOCABLE TRUST and MCKENZIE FAMILY TRUST; BARBARA MCKENZIE, as trustee of MCKENZIE FAMILY REVOCABLE TRUST, and COMMUNITY STATE BANK, | | **ORDER** |
| Defendants. | | |

This is an action to reduce an IRS assessment to judgment and execute on parcels of property allegedly owned by the taxpayer. Trial on the merits was held April 26, 2010 through April 30, 2010.[1] The record was held open after trial to submit proposed findings of fact and conclusions of law and to permit an opportunity for alternative dispute resolution. After consideration of all these matters, the Court enters judgment in favor of the United States.

The Court enters judgment on Count I against Charles McKenzie ("McKenzie") in the amount of $1,127,200.73; as to Count II, the Court enters judgment in favor of the United States and declares that federal tax liens arising from McKenzie's unpaid tax liabilities from tax years 1984-1987 attach to Parcels A and B, which are held by the McKenzie Family Trust and orders that the United States is authorized to enforce its federal

---

[1]The parties unsuccessfully attempted a court-sponsored settlement conference after the bench trial ended.

tax liens on Parcels A and B; and with respect to Count III, the Court enters judgment in favor of the United States and against the McKenzie Family Trust in the amount of $253,885 plus interest accruing under law. The Court makes the following findings of fact and conclusions of law.

## I. SUMMARY

Charles McKenzie ("McKenzie") is the taxpayer in this suit. He was formerly married to Barbara McKenzie, and they are the parents of Kristi Fleetwood[2] and Shane McKenzie. Scott Turner is the nephew of McKenzie.

The properties at issue in this suit include the following:

- Parcel A–Dick's Auto Sales
- Parcel B–24/7 Convenience Store
- Parcel C–913 North Fourth Street, Fulton, Illinois
- Parcel D–210 Fifteenth Avenue, Fulton, Illinois
- Parcel E–Fifty-four Acres of Land, Whiteside County, Illinois
- Parcel F–1000 North Fourth Street, Fulton Illinois ("Fulton House")
- Parcel G–431 Fifth Avenue South, Clinton, Iowa ("The Manor")
- Parcel H–2300-2302 Camanche Avenue, Clinton, Iowa ("Pizza Hut Building")
- Parcel I–110 Main Avenue, Clinton, Iowa ("Parkside Night Club")
- Parcel J–104 South Sixth Street, Clinton, Iowa

In October 1993, McKenzie created the McKenzie Family Trust ("MFT") and appointed his girlfriend, Sofia Simons, as the initial trustee of the MFT. Subsequent trustees included Kristi Fleetwood and Shane McKenzie, as well as Scott Turner, McKenzie's nephew. In January 1993, Barbara McKenzie created the McKenzie Family Revocable Trust

---

[2]Kristi Fleetwood, neé McKenzie, is referred to throughout by her married name as Kristi Fleetwood.

("MFRT"), and named herself as trustee. In October 1993, McKenzie transferred Parcels C, D, E, and F for little or no consideration to the MFT, and transferred Parcel J to the MFT in 1994 for little or no consideration. In January 1993, McKenzie transferred Parcels G and I to Barbara McKenzie for little or no consideration, which she then placed in the MFRT. The MFT later sold Parcels C, D, J, and a portion of Parcel E; the proceeds from these sales were invested in Parcels A and B.

The government alleges that McKenzie controls or owns the aforementioned properties through the use of alter egos or nominees, such as the trusts and his family members. On the basis of family relationships, commingling of funds and use for personal purposes, transfer of assets for little or no consideration, use of trusts for fraudulent purposes, and a lack of trust formalities, the government asks the Court to find that assets and the businesses operated on Parcels A and B are nominally held by the MFT and the MFRT and are the property of McKenzie. Further, on the basis of the Illinois fraudulent conveyance statute, the government asks the Court to set aside McKenzie's transfer of Parcels C, D, E, and F, or, in the alternative, to enter a judgment against the MFT for the sum of the fair market value of the parcels at the time of their disposal. McKenzie disputes that he owns or controls the trusts or any of the parcels.


## II. FINDINGS OF FACT

McKenzie was indicted on April 14, 1992, on four counts of willfully attempting to evade a substantial amount of income tax due and owing by him to the United States. (Stip. ¶ 4; Ex. 17.) The indictment charged McKenzie with willful attempt to evade or evasion of federal income tax liabilities for the calendar years 1984 through 1987, pursuant to 26 U.S.C. § 7201. (Stip. ¶ 4.) Under 26 U.S.C. § 7212, McKenzie was also charged with one count of obstructing and impeding the administration of Title 26 of the United States Code. (*Id.*)

McKenzie entered into a plea agreement on January 5, 1993, and pled guilty to one count of willfully attempting to evade and defeat a substantial amount of income tax due for

the calendar year of 1987. (Stip. ¶ 5; Ex. 18.) He stipulated that he attempted to evade his taxes for the years 1984 through 1986. (Stip. ¶ 6.) As a part of this plea agreement, McKenzie admitted that he had willfully and substantially underreported both his true taxable income and the true tax due and owing on the tax returns he filed for the years 1984 through 1987. (Stip. ¶ 7.) McKenzie admitted he had intentionally failed to report his true income by removing cash from the operations of the Parkside Nightclub in Clinton, Iowa. (Stip. ¶ 9.) For example, he underreported his true income by "skimming" cash receipts from the nightclub operations—including nightclub cover charges—and never reported this skimmed cash as income for the tax returns from 1984 through 1987. (Stip. ¶¶ 9-11.)

The Internal Revenue Service ("IRS") alleged that McKenzie had significantly impeded or obstructed the investigation of his tax liabilities. (Stip. ¶ 12.) According to the IRS and its investigating agents, including Agent Duane Hanaman, McKenzie made materially false statements when he told the IRS that his tax returns were accurate. McKenzie also allegedly lied when he told the IRS that he did not control the Parkside Nightclub and that he was not sheltering his money by having bank accounts in relatives' names. (*Id.*) The IRS investigation suggested that McKenzie used financial accounts in the names of others in order to disguise his income and his true financial condition. (Stip. ¶ 15.) The IRS alleged that McKenzie had structured large cash transfers of money into separate transactions of less than $10,000 each, in order to avoid financial reporting requirements. (Stip. ¶ 14.) Pursuant to a plea agreement, on April 5, 1993, McKenzie was convicted of one count of willfully attempting to evade his income tax liabilities for the tax year 1987. (Stip. ¶ 16.)

According to the IRS, the unpaid assessed balance of McKenzie's tax liabilities for the years 1984 through 1987 amounted to $570,002.86. The balances for each year were as follows:$135,780.74 in 1984; $82,644.31 in 1985; $266,066.60 in 1986; and $85,511.21 in 1987. Following the entry of this judgment, the IRS assessed additional taxes, penalties, and interest on McKenzie's income for the tax years 1984 through 1987. As of June 13, 2008,

the IRS alleged the amount of unpaid tax liabilities (including interest and penalties) for the tax years 1984 to 1987 totaled $1,127,200.73.[3] (Exs. 1, 206.)

The IRS used two indirect methods in order to calculate the amounts due and owing in taxes. (Ex. 208.) In the first method, the Source and Application of Funds, the IRS determines the amount of a person's expenditures or application of funds and compares this to a person's income source. If the expenditures or application of funds exceeds the income source, then any difference can be considered unreported income. In the second method, the Net Worth Analysis, the IRS compares the changes in a person's net worth from year to year with a person's yearly source of income. If a year over year increase in net worth exceeds a person's source of income for that year, then any difference can be considered unreported income.

The IRS civil examiners used McKenzie's originally-filed tax returns to estimate

---

[3]

| Tax Year | Assessment Date | Assessment Amount | | Unpaid Balance as of 6/13/2008 |
|---|---|---|---|---|
| 1984 | 7/27/1998 | Tax | $ 22,256.00 | $ 266,109.05 |
| | | Fraud Penalty | $ 38,700.06 | |
| | | I.R.C. 6662(d) Penalty | $ 5,564.00 | |
| | | Interest | $ 69,078.68 | |
| | 9/10/2007 | Collection Costs | $ 70.00 | |
| 1985 | 8/18/1986 | FTP | $ 18.75 | $ 154,036.89 |
| | | Interest | $ 25.09 | |
| | 12/29/1986 | FTP | $ 11.25 | |
| | | Interest | $ 10.07 | |
| | 8/24/1998 | Tax | $ 28,226.00 | |
| | | I.R.C. 6662(d) Penalty | $ 7,056.00 | |
| | | Fraud Penalty | $ 43,849.83 | |
| | 4/19/1999 | Restricted Interest | $ 3,541.98 | |
| 1986 | 7/27/1998 | Fraud Penalty | $ 85,383.08 | $ 534,794.12 |
| | | I.R.C. 6662(d) Penalty | $ 12,780.25 | |
| | | Tax | $ 51,161.00 | |
| | | Interest | $ 116,732.27 | |
| 1987 | 7/27/1998 | Fraud Penalty | $ 27,616.26 | $ 172,260.67 |
| | | I.R.C. 6662(d) Penalty | $ 4,498.75 | |
| | | Tax | $ 17,975.00 | |
| | | Interest | $ 35,426.20 | |
| | | **Total:** | | **$ 1,127,200.73** |

income for the years in dispute. The examiners then used Bureau of Labor statistics to estimate personal living expenses. (Exs. 208, 214.) At trial, Hanaman and Daniel Testroet, who assisted Hanaman in his investigation, both testified as to their calculations of McKenzie's income for the years in dispute. The examiners used both indirect methods independently to arrive at an estimated taxable figure. The examiners included within McKenzie's income the end-of-year bank account balances for accounts held in the name of his mother and step-father ("Workman accounts"). (Exs. 208, 214.) The examining agent, Duane Hanaman, explained that he imputed certain accounts of the Workmans[4] in McKenzie's yearly income because McKenzie exercised control over these accounts or commingled his personal money in these accounts, and the Workmans did not have the financial means to explain the substantial deposits in their accounts. (Exs. 197A, 209.) In some instances, McKenzie was the only one that appeared on signature cards that were available and he also signed withdrawal slips or checks. McKenzie testified that he did not have any control over or commingle the funds.

McKenzie signed an affidavit in 1994 reporting a $380,000 liability to the IRS. (ex. 22.) McKenzie admitted that he owed at least $380,000 and Testroet included this additional tax amount in his civil examination report. (Ex. 219.)

In addition, McKenzie[5] claimed at trial that he had income from silver holdings (that he owned approximately 600 pounds at one time) and that he had received some of the scraps of silver for free. The examiners credited McKenzie's alleged silver holdings and sale of silver as a source of income, but did not allow McKenzie to claim a 50 percent basis in the silver sales in 1984 and 1986, because there was no support for this claim.

---

[4]McKenzie testified that he was the sole caretaker for his terminally ill parents.

[5]McKenzie also disputes the IRS's consideration of his children as his nominees. But the government notes that even if the IRS did not review McKenzie's children's tax returns, this does not make the IRS's conclusion that McKenzie kept accounts in his children's names as arbitrary or unreasonable.

In summary, the Court finds that McKenzie was unable to present documentation or evidence to discredit the IRS's calculation of his income.

### A. McKenzie Family Trust is McKenzie's Alter Ego or Nominee

After McKenzie pled guilty, he immediately transferred[6] ten parcels of real estate to others, including his ex-wife, Barbara McKenzie ("Barbara"), and the McKenzie Family Trust[7] ("MFT"). In October 1993,[8] McKenzie funded the MFT with Parcels C, D, E, and F for little or no consideration. (Exs. 27, 41, 46, 52, 57, 78.) He also transferred Parcel J in 1994 to the MFT for little or no consideration. In January 1993, McKenzie transferred Parcels G and I to Barbara for little or no consideration, which she then placed in the McKenzie Family Revocable Trust ("MFRT") that she had created. (Stip. ¶¶ 61, 73.) McKenzie/MFT later sold Parcels C, D, J, and a portion of Parcel E, and invested the proceeds of these sales in Parcels A and B. These assets were not used to pay his tax liabilities for the years 1984 through 1987.

*Trustees:* When McKenzie created the MFT in 1993, he named his then-girlfriend, Sofia Simons, as the initial trustee of the trust. (Ex. 41.) Ms. Simons was also identified as

---

[6]In or around 1993, McKenzie also transferred property located at 927 S. 4th Street, Clinton, Iowa, to Warren Smith. (Ex. 20.) Warren Smith is an acquaintance of McKenzie. McKenzie owned and operated a used car lot, "Fourth Street Auto Sales," from that location after he transferred the property to Mr. Smith. McKenzie testified that he sold only his remaining inventory and wound down his business. At some point thereafter, Kristi and Shane McKenzie took title to the Fourth Street Auto Sales property and sold it to Hy-Vee in or around October 1996.

[7]McKenzie created the MFT in October 1993.

[8]In 1993, the Whiteside County Supervisor of Assessments assessed the fair market value of Parcel C at $12,936 ($4312 assessed valuation x 3), assessed the fair market value of Parcel D at $19,131 ($6377 assessed valuation x 3), and assessed the fair market value of Parcel F at $108,885 ($36,285 assessed valuation x 3). (Stip. ¶ 85.) Later, the MFT sold Parcel C for $60,000, Parcel D for $60,000, a portion of Parcel E for $25,000, and Parcel J for $61,055.05. (Stip. ¶¶ 26, 31, 39, 83.) The proceeds from the sales of these properties were not used to repay McKenzie's tax liabilities.

the settlor of the trust but did not contribute any property to the trust. Before and during her tenure as trustee, she lived at the Fulton House when it was held by the MFT. When Ms. Simons was trustee, she was not familiar with the assets of the trust, never received any annual reports from the trust, never negotiated rental agreements with tenants, and never signed checks drawn on the MFT's bank account. She was no longer a trustee as of October 9, 1994, with her resignation around the same time that she and McKenzie's personal relationship deteriorated. At this time, she also ceased living in the Fulton House with McKenzie. Ms. Simon claimed at trial that she never signed any tax returns but her signature appeared on a tax return dated April 19, 1996, after she was no longer trustee. This suggests her signature was placed on tax returns by others.

Barbara McKenzie confirmed that following Ms. Simons's resignation, subsequent trustees of the MFT included Kristi Fleetwood and Shane McKenzie,[9] as well as McKenzie's nephew, Scott Turner. (Ex. 28.) Barbara McKenzie and McKenzie jointly decided to name the subsequent trustees. Barbara McKenzie testified that during a portion of the time Kristi Fleetwood was a successor trustee, both Barbara McKenzie and McKenzie were aware that Ms. Fleetwood suffered from a drug addiction. Ms. Fleetwood confirmed this addiction and that her drug problem worsened between 1995 and 1998. The record shows many instances in which McKenzie disregarded the formalities of the trust. He signed Kristi's name to an assortment of documents over the years and used over $30,000 of funds in a brokerage account in her name to purchase real estate. (Ex. 62.)

The Court also notes that Barbara McKenzie was never formally a trustee of the MFT. However, testimony establishes that the MFT and MFRT were, in substance, treated as one entity. Barbara McKenzie was sometimes wrongly identified as a trustee of the MFT and Kristi Fleetwood was sometimes wrongly identified as a trustee of the MFRT. Barbara McKenzie has only been trustee of the MFRT, and Kristi Fleetwood has only been trustee

---

[9]Shane McKenzie resigned as trustee shortly after being identified as a successor trustee.

of the MFT.

The Court finds that none of the trustees of the MFT have been independent of McKenzie. The evidence introduced at trial established that the trustees were chosen by McKenzie based on his relationship to them and his ability to control them, control the trusts, and treat the trust assets as his own assets.

*Commingling of Property:* By 1994, McKenzie had transferred substantially all of his personal assets to the MFT and MFRT. He treated the assets of the MFT, MFRT, Ms. Fleetwood, 24-7 Convenience Store, and Dick's Auto Sales, as one entity. He collected rents from properties nominally owned by the MFT and also used funds owned by one person or entity to pay expenses for or improve property held by another. The Court finds that McKenzie exercised control over the MFT's bank account. (Exs. 103, 104.) For example, he deposited the proceeds from personal loans into the MFT's bank account and has used the MFT bank account to repay personally-held loans as well as personal credit card debt. (Ex. 103.) McKenzie also used MFT funds to pay expenses for the Fulton House and his home in Florida.[10] He has used the Fulton House as collateral and has personally guaranteed all loans to 24-7 Convenience Store, LLC, from Community State Bank. (Ex. 114.) He exercised control over MFT brokerage accounts and businesses run and operated by the MFT.

In addition, McKenzie transferred his home, the Fulton House (Parcel F), to the MFT in 1993 for no consideration. McKenzie repurchased this asset in 1998 and placed title to this property in the name of MFRT. He has not paid rent at this property, although he testified he has lived rent-free as compensation for work he does on behalf of the MFT. The loans encumbering the Fulton House have been repaid by funds from 24-7 Convenience

---

[10]Kristi Fleetwood acquired title to 1005 40th Street W., Brandenton, Florida ("Florida house") on December 14, 1995. Since that time, McKenzie has lived off and on at the property and has paid utility and property tax expenses for this home from his personal bank accounts. McKenzie claimed this address as his residence up to the present day, but rented the house to others from 1998 through 2003 or 2004.

Store, LLC, and Dick's Auto Sales (neither of which are MFT businesses). (Exs. 109, 115-20.)

*Formalities of a Trust*: The Court finds that the MFT does not adhere to the formalities of a trust imposed by law. Between 1996 and 2008, the MFT did not file tax returns, as required by 26 U.S.C. § 6012(a)(4) for any trust having for the taxable year any taxable income, or having gross income of $600 or more. (Exs. 12, 191.) The MFT filed a tax return for the tax year 1993 in 1996, but that return was signed by a former trustee, Ms. Simons. (Ex. 11.) Also in 1996, Ms. Simons signed a lease agreement for Parcel D on behalf of the MFT, even though she had resigned as trustee of the MFT two years prior. (Ex. 39.) The MFT also does not adhere to trust requirements such as keeping financial records, providing financial statements to the nominal settlor of the trust (Ms. Simons), or signature requirements for distributing funds from the MFT. (Ex. 27.) The trust also failed to, as required by the trust document, make all distributions from the trust by check and require countersignatures for single distributions exceeding $500 by Kristi Fleetwood and Shane McKenzie.

Based on the foregoing facts, the Court finds that the MFT and MFRT are McKenzie's nominee or alter ego entities.

### B. MFT and MRFT Properties

The Court makes the following findings regarding the properties that McKenzie owns or controls through the MFT and MRFT. The Court finds in favor of the government as to all properties.

### Parcel A—"Dick's Auto Sales"

Parcel A is the location of the business Dick's Auto Sales. Title was transferred from Firstar Bank, N.A. to Kristi Fleetwood, as trustee of the MFT, on November 20, 2000. (Exs. 32, 34.) The deed to Parcel A identifies the trust as the MFRT. McKenzie testified that Dick's Auto Sales is a sole proprietorship wholly and personally owned by Barbara

McKenzie. But McKenzie negotiated and arranged for the financing for the purchase of this property, signed Kristi Fleetwood's name on the offer to purchase the property, and used funds from the MFT's bank account to pay the earnest money accompanying the offer. (Exs. 32, 103, 129, 152-54, 196.) McKenzie also represented to Community State Bank that he intended to lease the Dick's Auto Sales property from the MFT. There is no evidence of a lease between Dick's Auto Sales and the MFT, and the MFT has not filed tax returns reporting any rental income from Dick's Auto Sales.

McKenzie has represented in numerous ways to others that he is the owner of Dick's Auto Sales. Todd Mueller, a mechanic, did business with McKenzie at Dick's Auto Sales, and he thought the business belonged to McKenzie. Goldie Thompson, as recently as 2009, represented to Dick's Auto Sales's insurance agent that McKenzie was the owner of Dick's Auto Sales. (Ex. 35.) Ms. Thompson does office work for both Dick's Auto Sales and 24/7 Convenience Store, LLC and is familiar with both businesses. In October 2003, McKenzie represented to the Greater Quad City Auto Auction that he was a corporate officer of Dick's Auto Sales, and signed Greater Quad City Auto Auction documents as an "owner, partner or president." (Ex. 36.) While representing himself as a "co-owner" of Dick's Auto Sales on Community State Bank paperwork, he paid Dick's Auto Sale's operating expenses out of Dick's Auto Sales accounts.

Other facts support McKenzie's ownership and control of Dick's Auto Sales. He purchases new inventory for Dick's Auto Sales and uses cars[11] titled in the name of Dick's Auto Sales for his own personal use. He paid housing expenses at the Fulton House from the Dick's Auto Sales bank account. He has also used a credit card issued to Dick's Auto Sales or funds of Dick's Auto Sales for personal expenses, including a Netflix subscription, YMCA dues, groceries, and upkeep for his personal residence. (Exs. 107, 151.) He shifts funds between Dick's Auto Sales and 24/7 Convenience Store. For example, he used funds

---

[11]McKenzie uses cars titled in Dick's Auto Sales' name as his personal vehicles and has titled at least one personal Corvette in the name of Dick's Auto Sales.

from 24/7 Convenience Store and his personal bank accounts to make payments on a credit card issued to Dick's Auto Sales. He also used 24/7 funds to repay a loan personally held by McKenzie and Barbara McKenzie on October 11, 2003. (Exs. 139, 140.) McKenzie used funds from Dick's Auto Sales to pay the property taxes on the 24/7 Convenience Store. (Ex. 107.) Funds from Dick's Auto Sales are also used to support the cash needs of the 24/7 Convenience Store. On November 13, 2008, McKenzie authorized the transfer of $8000 from the bank account of Dick's Auto Sales to satisfy the cash needs of 24/7 Convenience Store, LLC. (Exs. 107, 109.)

McKenzie testified that Barbara McKenzie is the owner of Dick's Auto Sales and he merely assists in running the business. Based on the evidence, the Court does not find this assertion credible. The Court finds that McKenzie owns and completely controls the business.

### Parcel B—"24/7 Convenience Store"

Parcel B is the location of the 24/7 Convenience Store. Title to Parcel B was transferred on November 1, 1999 from Darlene and Arthur J. Johnson to the McKenzie Family Trust, Kristi Fleetwood, Trustee. (Exs. 37, 38.) Arthur Johnson only dealt with McKenzie to discuss and finalize the sale of Parcel B. McKenzie testified that he did not own 24/7 Convenience Store but only negotiated the purchase of the property and signed the initial offer to purchase the property.[12] The Court finds that McKenzie exercises control over the property, benefits from the property, and invests his time and money in this property with the expectation of realizing a return of his investment, as to both 24/7 Convenience Store and Parcel B.

McKenzie constructed and designed new buildings for a convenience store on the property. He invested equity from his home, the Fulton House, to improve the property.

---

[12]The deed of sale mistakenly identifies the MFT as the MFRT.

The investment in the improvements totaled approximately $300,000 in 2002. McKenzie anticipated having his daughter Kristi Fleetwood operate the store for him, but he repeatedly represented to others that he owned this property (as well as Parcel A, Dick's Auto Sales). He is also identified as the manager of 24/7 Convenience Store on financial documents. For example, he was identified as a "partner" on a credit card application for 24/7 Convenience Store in 2002 and as an "owner" on another credit card account. (Exs. 144, 148.)

McKenzie has signature authority for 24/7 Convenience Store's operating account and regularly exercised this authority to pay 24/7 Convenience Store's operating expenses. (Exs. 110, 116.) McKenzie also used 24/7 Convenience Store's Capitol One credit card (account ending in 8534) in 2002 to pay for non-business related purchases, such as purchases at K-Mart and Super 8 in Fairmont, Minnesota. (Ex. 146.) In 2003, McKenzie used the Capitol One credit card to make non-business expense purchases at a Rent-All in Bradenton, Florida, payments to Leisure Plus, Atlantis Spa in Nassau, Bahamas, and Six Flags Great America theme park. (*Id.*) In 2004, the Capitol One credit card was used to pay for non-business expenses from Rent-All in Bradenton, Florida, and the Wal-Mart Supercenter and Home Depot in Bradenton, Florida. (*Id.*) In 2005, McKenzie used the Capitol One credit card to make non-business expenses, when he purchased AirTran plane tickets. McKenzie testified that these expenses were all reimbursement or work-related, such as the plane tickets, which were for his travel to purchase vehicles for Dick's Auto Sales and drive them back. (*Id.*) This Capitol One credit card was repaid with funds from 24/7 Convenience Store, LLC's checking account and Dick's Auto Sales's checking account. (*Id.*)

McKenzie's name was also on another Capitol One credit card associated with the 24/7 Convenience Store but called "Twenty Four Seven" (with account number ending in 7820). (Ex. 145.) Expenses on this credit card included purchases from the following: Mr. Bones BBQ, Inc., Holmes Beach, Florida; House of Blues Orlando, Buena Vista, Florida; and Cosmo's Restaurant, Orange Beach, Alabama. (*Id.*) This credit card was repaid with

funds from McKenzie's personal bank accounts and 24/7 Convenience Store's bank accounts. (*Id.*) For example, McKenzie paid $831.02 on June 9, 2007 and $179.84 on July 18, 2007 toward the account ending in 7820, from his own personal checking account. (*Id.*) But in June 2007, funds from the 24/7 Convenience Store, LLC's checking account were used to pay off $151.00 for this same credit card. (*Id.*)

McKenzie also personally benefitted from loans associated with 24/7 Convenience Store. He personally borrowed money to purchase inventory for 24/7 Convenience Store and repaid this loan with funds from the MFT's bank account. (Exs. 132, 134.) In February 2001, the funds from loan number 920063 were deposited in 24/7 Convenience Store's bank account. McKenzie then wrote a check drawn from the 24/7 Convenience Store's bank account in the amount of $10,239.17 to repay loan number 9200603. (Exs. 136, 137, 220.) On June 12, 2003, another loan to McKenzie and Barbara McKenzie individually was also repaid in part by using funds from 24/7 Convenience Store. (Exs. 109, 139.) He also regularly made cash withdrawals from 24/7 Convenience Store's bank account. (Ex. 109.)

Kristi Fleetwood testified that the MFT only owns the land underneath the buildings and does not own the buildings located on Parcel B. But the MFT reported that the 24/7 Convenience Store did not pay it rent. Further, there is no written lease or contract defining 24/7 Convenience Store, LLC's rights to any of the real property. 24/7 Convenience Store is operated by 24/7, LLC, of which Kristi Fleetwood personally holds a 95 percent share and Barbara McKenzie a 5 percent share.

There is more evidence of McKenzie's control of this property. McKenzie negotiated with Manjit Singh Wahla in 2008 for the possible sale of the property, including setting and agreeing to a sale price. (Ex. 39.) The sale did not go through because several contingencies of the proposed sale were not met, including environmental remediation and the buyer securing financing and obtaining final approval.

In sum, McKenzie commingled the funds of 24/7 Convenience Store and Dick's Auto Sales. There is evidence that funds from one business were used for the other, or to repay

McKenzie's personal loans. McKenzie also regularly made cash withdrawals from 24/7 Convenience Store's bank account. The Court finds McKenzie owns and controls 24/7 Convenience Store.

*Parcel C—913 North Fourth Street, Fulton, Illinois*

Parcel C was a residential rental property located in Fulton, Illinois. McKenzie acquired the property from Terry Norem on or about May 25, 1988. McKenzie transferred Parcel C to Sofia Simons, as trustee for the MFT, on July 1, 1993, but did not record the transfer until October of 1993. (Ex. 41.) The transfer was for little or no consideration. On or about March 31, 1995, the MFT agreed to sell Parcel C to Alan and Phyllis Hammer for $40,000. The installment sales contract directed payments to be made to the seller's residence or as otherwise directed and that notices should be addressed to the seller at the Manor property. (Ex. 42.) At this time in 1995, the Manor was owned by the MFRT and McKenzie resided there.

McKenzie solicited renters for the property and collected rent. For example, according to Karen Garrison (at the time, known as Karen Urban), McKenzie collected her cash rental payments when she lived there in approximately 1998 or 1999. (Ex. 216.) Ms. Garrison had responded to a newspaper ad bearing McKenzie's telephone number, and, at trial, Ms. Garrison referred to McKenzie as her "landlord." The agreement to rent the property was oral.

McKenzie testified that he made improvements to the property, including ripping up the floor to cover the existing pipes and to install new pipes to prevent them from freezing in the winter. McKenzie's residence at the time of renting to Garrison was at the Fulton House, which was across the street from Parcel C.

On or about August 3, 2001, the MFT entered into another real estate sales contract with Alan and Phyllis Hammer, selling Parcel C to the Hammers for $60,000. Kristi Fleetwood, as trustee of the MFT, transferred title of Parcel C to the Hammers on December

3, 2002.  The proceeds of sale were deposited in the MFT bank account.  (Ex. 103.)

### *Parcel D—210 Fifteenth Avenue, Fulton, Illinois*

Parcel D is a commercial rental property located in Fulton, Illinois.  McKenzie acquired title on February 12, 1988.  McKenzie transferred Parcel D to Sofia Simons, as trustee for the MFT, on July 1, 1993, but did not record the transfer until October of 1993.  (Ex. 46.)  The transfer was for little or no consideration. After the transfer, McKenzie collected rent payments, maintained the property, and negotiated rental leases.

Michel Ottens rented Parcel D from October of 1995 through April of 1998.  McKenzie negotiated two separate leases with Mr. Ottens; the first was for one year and the second extended the first lease.  In September of 1996, Simons signed the second lease to rent the property, even though she was no longer trustee of MFT by that time.  (Ex. 49.)  Mr. Ottens made his rental checks payable to the MFT.  He also stated that McKenzie came by to pick up rental checks or instructed him to mail the checks to the Manor.  During the latter part of the lease, he also mailed checks down to Bradenton, Florida,  On at least one occasion, McKenzie then endorsed rent checks payable to the MFT and deposited a portion of the rent checks in an Edward Jones brokerage account in the name of Barbara McKenzie, as trustee of the MFRT.  (Exs. 48, 50, 163.)

On July 31, 2003, the MFT transferred title of Parcel D to Anthony Layne for $60,000. The sale proceeds, totaling $57,891.95, were deposited on September 25, 2003, in the MFT's bank account with Community State Bank.  McKenzie endorsed the check by signing both his name and his daughter's name, Kristi Fleetwood.

### *Parcel E—Fifty-four Acres of Land, Whiteside County, Illinois*

Parcel E consists of 54 acres of undeveloped land located in Whiteside County, Illinois.  McKenzie transferred Parcel E to Sofia Simons, as trustee for the MFT, on July 1, 1993, but did not record the transfer until October of 1993.  (Ex. 52.)  The MFT, with Kristi

Fleetwood then as trustee, transferred title to Kristi Fleetwood on February 11, 1997. On July 12, 2001, Kristi Fleetwood transferred a portion of Parcel E to James and Brenda Driscoll for $25,000. The sale proceeds were deposited in the 24/7 Convenience Store's bank account.

McKenzie continued to pay utility and property tax expenses associated with a storage building located on Parcel E even after it was transferred out of his name. He used funds in his personal bank accounts and a bank account in the name of Dick's Auto Sales to pay these expenses. For example, he paid utility expenses on June 16, 2006 from his personal Bank of America account, and in 2008, paid utility and property tax expenses from his personal Wells Fargo account. (Exs. 96, 100, 190.) In 2003, 2007, and 2008, McKenzie paid utility expenses for the storage building from a Dick's Auto Sales bank account. (Exs. 107, 190.)

In the summer of 2005, McKenzie contracted with Dave Meyer Logging, LLC, for the removal and sale of timber from the remaining portion of Parcel E. McKenzie represented to Meyer that he owned the property. He arranged for McKenzie to receive 60 percent of the sale of the timber, with Mr. Meyer receiving the other 40 percent. Meyer wrote a check for $9234 to McKenzie as proceeds of the sale of the timber. McKenzie deposited the check for $9234 in his personal bank account.

*Parcel F—1000 North Fourth Street, Fulton, Illinois ("Fulton House")*

McKenzie acquired title to the Fulton House on August 21, 1985. He transferred title to Sofia Simons, as trustee of the MFT, on July 1, 1993, for little or no consideration. (Ex. 57.) The MFT transferred title to Scott Turner[13] and Shane McKenzie on June 2, 1994. In the summer of 2005, Scott Turner and Shane McKenzie transferred title to George Chamberlain. Mr. Chamberlain is a family friend of the McKenzies and negotiated for the sale of the property with McKenzie alone.

---

[13]Scott Turner is McKenzie's nephew.

17

On July 2, 1998, Mr. Chamberlain transferred title of the Fulton House to the MFRT. For this sale, Mr. Chamberlain only met with McKenzie, without discussing or negotiating the sale with Barbara McKenzie, who was the trustee of the trust acquiring ownership. Mr. Chamberlain said that McKenzie was "the face of the trust." The funds used to purchase the Fulton House from Mr. Chamberlain were drawn from Edward Jones accounts in the names of Barbara McKenzie, as trustee of the MFT, and Kristi Fleetwood. McKenzie signed his ex-wife's name and daughter's name to the checks used to purchase the Fulton House from Mr. Chamberlain. (Ex. 62.)

Testimony from Art Johnson, Karen Garrison, Todd Mueller, Adam McKenzie, and McKenzie's own testimony, establish that McKenzie lived at the property from at least 1998 to the present. McKenzie testified that he did not live at the Fulton House for free, because he performed maintenance work on properties held by the trust and Ms. Fleetwood personally, and he helped raise the McKenzie grandchildren. The Fulton House was listed as his residence[14] on financial documents and correspondence and was the address for the MFT. (Exs. 25, 33, 36, 104.) Additionally, McKenzie paid utilities and property taxes for the Fulton House from his personal bank accounts and Dick's Auto Sales's bank account, and used the equity in this property to finance his construction and operation of the 24/7 Convenience Store and the operation of Dick's Auto Sales. For example, in July of 2000, Community State Bank issued a $30,000 line of credit to Barbara McKenzie and McKenzie individually for the stated purpose of a "business line of credit." (Exs. 121, 139.) In October of 2001, Community State Bank issued a $150,000 "commercial construction" line of credit to Barbara McKenzie and the MFRT. (Exs. 115, 117.) Both of these loans were secured by a mortgage encumbering the Fulton House. McKenzie had authorization to request advances on these lines of credit. This loan financed improvements to the 24/7 Convenience Store property.

---

[14]Before McKenzie re-purchased the Fulton House from Mr. Chamberlain, he was living down in Bradenton, Florida.

From at least 2003 to 2010, the utility accounts for the Fulton House were in McKenzie's name. He paid utility expenses from his personal bank accounts and Dick's Auto Sale's bank account. (Exs. 100, 107, 190.) McKenzie also authorized the payment of property taxes for the Fulton House from Dick's Auto Sales funds, as well as paying property taxes and other expenses from his own personal bank accounts. (Exs. 65, 96, 107.)

### Parcel G—431 Fifth Avenue South, Clinton, Iowa ("The Manor")

McKenzie acquired title to Parcel G, referred to as "The Manor," on October 15, 1992. On or about January 13, 1993, McKenzie transferred title to the Manor to Barbara McKenzie, for little or no consideration. On June 2, 1993, Barbara McKenzie transferred title to the MFRT. McKenzie continued to live rent-free at the Manor after it was transferred to Barbara McKenzie and the MFRT. (Exs. 192, 198.)

Barbara McKenzie, as trustee of the MFRT, transferred title to K.A.S. of Manatee on March 21, 1997. Kristi Fleetwood was the president and secretary of K.A.S. of Manatee, which was administratively dissolved on September 26, 1997. On January 9, 2001, Kristi and Todd Fleetwood transferred title to David and Theresa Collins for $150,000. David Collins met only with McKenzie for purchase discussions and inspections of the property. The realtor representing the seller said that McKenzie was the seller of the property.

On January 16, 2001, proceeds of $114,705.10 from the sale of the Manor were deposited in the 24/7 Convenience Store bank account at Community State Bank. As a result, proceeds from the sale of the Manor were used to finance the operation and construction of 24/7 Convenience Store.

### Parcel H—2300-2302 Camanche Avenue, Clinton, Iowa ("Pizza Hut Building")

Kristi Fleetwood acquired title to Parcel H on May 14, 2001, from James V. and Jude Golinvaux. This property is referred to as the "Pizza Hut Building" but is currently the location of the El Tapatio Restaurant. Kristi Fleetwood testified that the rent from El Tapatio

19

was paid directly to McKenzie in order to reimburse him for maintenance expenses. McKenzie testified that he collected the rent personally and deposited the money in his personal checking account. He also testified that he used funds from his personal bank account to pay for property taxes and improvements to the Pizza Hut Building. (Exs. 100, 205.)

Danaca Raab, an accountant, confirmed that funds from the 24/7 Convenience Store are used to pay for expenses associated with the Pizza Hut Building, including the mortgage. McKenzie did not file tax returns reporting income earned from the Pizza Hut Building until after the United States initiated this lawsuit against him.

### Parcel I—110 Main Avenue, Clinton, Iowa ("Parkside Night Club")

McKenzie transferred title of Parcel I to Barbara McKenzie on or about January 14, 1993, for little or no consideration. Parcel I was the location of the Parkside Night Club. Barbara McKenzie transferred title to Barbara McKenzie, trustee of MFRT, on June 2, 1993. As trustee of the MFRT, Barbara McKenzie transferred title to Robert Labak on April 5, 1997.

### Parcel J—104 South Sixth Street, Clinton, Iowa

Prior to May 1994, McKenzie held title to Parcel J. On or about May 18, 1994, McKenzie quit-claimed his interest in Parcel J to the MFT for little or no consideration. Kristi Fleetwood, as trustee of the MFRT, transferred title to Parcel J to Kristi Fleetwood individually for little or no consideration on June 6, 2006. Three days later, on June 9, 2006, Kristi and Todd Fleetwood transferred title to Ardella Anderson. The proceeds of the sale, or approximately $61,055.55, were deposited in Dick's Auto Sales' Community State Bank account on June 22, 2006. (Ex. 107.) McKenzie signed his daughter's name to the check from Ms. Anderson purchasing the property. (*Id.*) McKenzie testified that he continued to use his personal funds to pay for expenses associated with Parcel J, even after transferring

Parcel J to the MFT. (Ex. 96.)

III. CONCLUSIONS OF LAW

## III. CONCLUSIONS OF LAW

### A. Count I

In determining the findings for the tax assessment, the Court must presume that the IRS tax assessment and related findings are correct. *Wickwire v. Reinecke*, 275 U.S. 101 (1927); *Ferguson v. United States*, 484 F.3d 1068, 1077 (8th Cir. 2007) (citing *Riley v. United States*, 118 F.3d 1220, 1221 (8th Cir. 1997)); *Anderson v. United States*, 561 F.2d 162, 165 (8th Cir. 1977). "This presumption [of correctness] applies even if the assessment is based on an estimate, so long as the method for making the assessment is reasonable and logical." *Ferguson*, 484 F.3d at 1077 (citing *Dodge v. Comm'r*, 981 F.2d 350, 353 (8th Cir. 1992)). However, a naked assessment[15] is not entitled to a presumption of correctness, *id.,* but the assessments are expected to be rational, not flawless. *Id.* (citing *Caulfield v. Comm'r*, 33 F.3d 991, 993 (8th Cir. 1994)). The Court must accept the IRS's method of reconstructing or calculating income so long as it is rationally based. *Dodge*, 981 F.2d at 353.

The taxpayer must then present evidence to rebut the presumption of correctness, and the taxpayer bears the burdens of production and persuasion as to all issues, including lack of willfulness. *Honey v. United States*, 963 F.2d 1083, 1087 (8th Cir. 1992); *Funk v. Comm'r of Internal Revenue*, 687 F.2d 264, 266 (8th Cir. 1982); *Anderson*, 561 F.2d at 165 ("The burden is upon the party assessed to prove that it was not a responsible person or that its failure to pay the taxes was not willful.") (citations omitted). The taxpayer also bears the burden of establishing that an assessed penalty is erroneous. *Funk*, 687 F.2d at 266; *Thompson v. United States*, 523 F. Supp. 2d 1291, 1296 (N.D. Ala. 2007) (if the taxpayer's evidence amounts to something more than implausible factual assertions, then the burden of

---

[15] "[A] naked assessment [is] one made "without any foundation whatsoever, or without some predicate supporting evidence."" *Id.* (quoting *Dodge*, 981 F.2d at 353).

proof shifts to the United States to show that its assessment of tax liability is correct).  The taxpayer must persuade the trier of fact by a preponderance of evidence that the deficiency was factually incorrect.  *Id.* at 700; *see also* 26 U.S.C. § 6321.  If a taxpayer "introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer . . . the Secretary [shall] then have the burden or proof with respect to such issue." 26 U.S.C. § 7491.

Here, it was reasonable for IRS Agents Testroet and Hanaman to use indirect methods, a Source and Application of Funds analysis and a Net Worth analysis, to estimate McKenzie's income for the years 1984 through 1987.  *See United States v. Strebler*, 313 F.2d 402, 403–04 (8th Cir. 1963) (quotation omitted).  There is evidence that McKenzie substantially under-reported income on his tax returns for the years 1984 through 1987. Their calculations of taxes due and owing are presumed correct because they were based on assessment methods that are reasonable and logical.  *Ferguson*, 484 F.3d at 1077.  McKenzie has not provided any evidence proving that the IRS's calculations were incorrect or establishing the correct amount of taxes he owes.

Because McKenzie has not provided evidence to overcome the presumption of correctness, *see Honey*, 963 F.3d at 1087, the government is entitled to judgment entered in its favor.  The Court finds that the United States is entitled to a judgment in the amount of $1,127,200.73 plus interest accruing under law after June 13, 2008, pursuant to 26 U.S.C. § 6601, 6621, and 6622, and 28 U.S.C. § 1961(c) until paid.

## B. Count II

The United States has a lien "upon all property and rights to property" belonging to an individual who is liable for unpaid taxes.  I.R.C. § 6321; 26 U.S.C. § 6321.  The lien arises at the time the tax assessment is made and continues "until the liability for the amount so assessed (or a judgment against the taxpayer arising out of such liability) is satisfied or becomes unenforceable by reason of lapse of time."  26 U.S.C. § 6322.  United States

income tax liens are perfected upon assessment and the effective date of the lien reverts to the date of assessment. I.R.C. §§ 6321, 6323; 14A MERTENS LAW OF FED. INCOME TAX'N § 54A:38; *Grocers Wholesale Co-op., Inc. v. Goodrich*, 251 F. Supp. 751, 753 (S.D. Iowa 1966) (from date of tax assessment, federal government had a perfected and choate lien on taxpayers' property).

Procedurally, the Secretary of Treasury may enforce a tax lien by filing suit in federal district court. 26 U.S.C. § 7403(a). A judgment of a district court on a tax judgment creates liens on property within the state, under the same conditions as a judgment of a court of general jurisdiction in such state. *United States v. Brown*, 835 F.2d 176, 179 (8th Cir. 1987); *Meyerson v. Council Bluffs Savings Bk.*, 824 F. Supp. 173, 175 (S.D. Iowa 1991). The IRS acquires by its lien and corresponding judgment, no greater right to property than the taxpayer himself has at the time the lien arises. *St. Louis Union Trust Co. v. United States*, 617 F.2d 1293, 1301 (8th Cir. 1980) (citing *Aquilino v. United States*, 363 U.S. 509 (1958).

The government is not limited to only collecting upon the assets of the taxpayer. It may also "collect the tax debts of a taxpayer from assets of the taxpayer's nominee, instrumentality, or 'alter ego.'" *United States v. Scherping*, 187 F.3d 796, 801 (8th Cir. 1999) (quoting *G.M. Leasing Corp. v. United States*, 429 U.S. 338, 350–51 (1977)) (other citations omitted). *See also Horton Dairy, Inc. v. United States*, 986 F.2d 286, 290–91 (8th Cir. 1993) (citations omitted). Although the doctrine is most often applied with regard to corporations, it also applies to trusts. *Vaughn v. Sexton*, 975 F.2d 498, 504 (8th Cir. 1992), *cert. denied*, 507 U.S. 915 (1993). "In determining the economic reality of a transaction, courts must analyze the substance of a transaction and are not restricted by its form." *Id.* (citing *Gregory v. Helvering*, 293 U.S. 465, 469–70 (1935); *Estate of Sachs v. Comm'r*, 856 F.2d 1158, 1164 (8th Cir. 1988)). Taxpayers may reduce their tax burden by lawful means, but cannot "'construct paper entities to avoid taxation when those entities are without economic substance.'" *Id.* (quoting *Chase v. Comm'r*, 59 T.C.M. (CCH) 261, 264, 1990 WL 33360 (1990) (citations omitted), *aff'd*, 926 F.2d 737 (8th Cir. 1991)).

Federal courts must then look to state law to determine whether an entity is the alter ego, instrumentality, or nominee of the taxpayer.[16] *Id.* at 802 (citing *Loving Saviour Church v. United States*, 723 F.2d 1085, 1086 (8th Cir. 1984) (per curiam)). The Eighth Circuit Court of Appeals listed non-exhaustive factors under Iowa law to be considered in determining whether a separate legal entity is a taxpayer's alter ego: (1) "the family relationship between the entity's officers and the taxpayer;" (2) "the commingling of entity and personal funds and expenses;" (3) "use of the entity's assets for personal purposes;" (4) "transfer of valuable assets from the taxpayer to the entity for little or no consideration;" and (5) "use of the entity for fraudulent purposes." *Hinson*, 994 F.2d 843, at *1 (8th Cir. 1993) (table) (citations omitted). Courts should then consider these factors "under the totality of the circumstances." *United States v. Engels*, 2001 WL 1346652, at *11 (N.D. Iowa Sep. 21, 2001); *Howe v. Varity Corp.*, 1989 WL 95595, at *8 (S.D. Iowa 1989), *rev'd on other grounds*, 869 F.2d 1107 (8th Cir. 1990) (citing *United States v. Jon-T Chemicals, Inc.*, 768 F.2d 686, 693 (5th Cir. 1985), *cert. denied*, 475 U.S. 1014 (1986)).

The Court examines these factors in turn and the totality of the circumstances to determine whether the MFT is McKenzie's nominee or alter ego. *Engels*, 2001 WL 1346652 at *11.

### 1. Family Relationship

The Court first considers the family relationship between MFT and McKenzie.

---

[16]While technically distinct theories, the nominee or alter ego theories share the critical factor of determining "whether the taxpayer exercised active or substantial control over the property." *Baum Hydraulics Corp. v. United States*, 280 F. Supp. 2d 910, 917 (D. Neb. 2003). The alter ego theory "means other self-where one person or entity acts like, or, for another to the extent that they may be considered identical." *Scherping*, 187 F.3d at 801. The nominee theory is based on equitable principles and "is utilized to determine whether property should be construed as belonging to the taxpayer if he/she treated and viewed the property as his/her own, in spite of the legal machinations employed to distinguish legal title to the property." *Baum Hydraulics Corp.*, 280 F. Supp. 2d at 916. The theories appear to be used interchangeably. *See id.* (citing *United States v. Taylor*, 2001 WL 1636505, at *6 (D. Minn. Oct. 24, 2001) (referring to the "nominee/alter ego doctrine" and "alter ego/nominee theory").

*Hinson*, 994 F.2d at *1.  It is undisputed that none of the MFT trustees have been independent of McKenzie.  The first trustee was his then-girlfriend, Ms. Simons, followed by his daughters, Kristi Fleetwood and Shane McKenzie, and his nephew, Scott Turner. McKenzie had the ability to remove trustees, such as when he removed Ms. Simons as a trustee after their personal relationship deteriorated.  He also undisputedly carried on the day to day management of the MFT, including the power to negotiate contracts, buy and sell real estate, and manage the bank accounts and investments of the MFT.  There was no outside influence or "check" on McKenzie's control of the MFT and its trustees.[17]  For example, Kristi Fleetwood served as a trustee during a period when she had no ability to handle its business.  Likewise, Shane McKenzie resigned as a trustee shortly after her selection as a successor trustee, and there was no evidence presented at trial that Scott Turner was ever active as a trustee.

The Court finds that for all practical purposes, McKenzie continued to exercise substantial control over the MFT assets and his broad exercise of authority weighs in favor of finding for the government on the nominee/alter ego issue.  *See F.P.P. Enters. v. United States*, 830 F.2d 114, 117–18 (8th Cir. 1987) ("A transaction will not be given effect according to its form if that form does not coincide with the economic reality and is, in effect, a sham."); *Edison v. C.I.R.*, 148 F.2d 810, 814 (8th Cir. 1945) (one who parts with control an asset, as well as with legal title, but retains substantially his previous power to control the asset, still controls the asset).

### 2. Commingling of Funds and Use for Personal Purposes

Next, the Court examines the degree to which trust and personal funds and expenses were commingled, and whether trust assets were used to pay for personal expenses.  *Hinson*,

---

[17]The Court also notes that the businesses operated on Parcels A (Dick's Auto Sales) and B (24-7 Convenience Store) are nominally owned by close family members, Barbara McKenzie and Kristi Fleetwood.

994 F.2d at *1. Here, there is no question that there was continuous commingling between McKenzie's personal funds and expenses and income of the trusts. McKenzie transferred substantially all of his personal assets to the MFT and Barbara McKenzie (who then transferred the assets to the MFRT). McKenzie has since treated the assets of the MFT and MFRT as his own, as well as the businesses nominally owned by Kristi Fleetwood and Barbara McKenzie. The record shows many instances in which McKenzie made no practical distinction between the trusts and his personal finances.

For example, McKenzie lived rent-free at properties titled in the name of the trusts, funds from the trusts were used to repay McKenzie's personal loans and credit card payments, funds from the trust were used for personal expenditures, and McKenzie financed the improvements to Parcel B and operations of the businesses located at Parcels A and B with proceeds from the sale of property he had transferred to the MFT. There is additional evidence that McKenzie used the Fulton House (an MFT asset) for loans made to the MFRT (used to finance improvements to the 24-7 Convenience Store), and used the Fulton House for loans to finance the operations of Dick's Auto Sales. The loans reveal a hodge-podge of one asset in a trust securing financing for an asset in another trust. Furthermore, funds from one business oftentimes were used to finance the operation of another business. It is also undisputed that McKenzie personally profited from the sale of timber located on Parcel E, which was a MFT asset. McKenzie also exercised control over brokerage accounts in the name of the MFT.

As for the businesses operating on Parcels A and B, McKenzie has signature authority and exercises authority over the 24-7 Convenience Store and Dick's Auto Sales bank accounts. He negotiated the purchase of the parcels and signed Kristi Fleetwood's name on the paperwork to purchase Parcel A. He is identified as a "partner" of 24-7 Convenience Store on a credit card application and is the only account owner of a Capital One credit card, that is in the name of "24-7 Convenience Store, LLC, Charles H. McKenzie." McKenzie also made improvements to Parcel B and maintained Parcel A, as well as managed and

collected rents from Parcels C and D.

The Court finds that the extensive commingling of funds and use for personal purposes weighs in favor of finding for the government on this factor. Trust arrangements are shams for tax purposes if the trust originator retains control over property or income placed in trust, and does not change the manner in which property or income is treated. *United States v. Noske*, 117 F.3d 1053, 1059 (8th Cir. 1997); *see also Muhich v. C.I.R.*, 238 F.3d 860, 864 (7th Cir. 2001) (taxpayers' transfers of assets to trusts, in attempt to have trusts pay personal expenses, were sham transactions); *Don Gastineau Equity Trust v. United States*, 687 F. Supp. 1422 (C.D. Cal. 1998) (trust invalid where taxpayers "retained the complete unrestricted beneficial use of the real property at issue"); *Lewis G. Allen Family Trust v. United States*, 558 F. Supp. 152 (D. Kan. 1982) (noting taxpayer/trustee used property transferred in same manner as prior to transfer and personal needs were paid for by advances from the trust).

### 3. Transfer of Assets for Little or No Consideration

Another factor weighing in favor of the government is that McKenzie transferred several parcels of real estate to the MFT and Barbara McKenzie for little or no consideration. *Hinson*, 994 F.2d at *1. Shortly after he agreed to plead guilty to income tax evasion in 1993, he transferred Parcels G and I to Barbara McKenzie for no consideration. After pleading guilty, he transferred Parcels C, D, E, and F to the MFT for no consideration. He later transferred Parcel J to the MFT in 1994. In 1993, the assessed fair market values of Parcels C, D, and F were approximately $12,936, $19,131, and $108,955, respectively. In 2000, the MFT represented in a financial statement that the values of Parcel C, D, and E, were $55,000, $60,000, and $80,000, respectively. McKenzie did not use any of these properties to repay his tax liabilities. *Loving Saviour Church*, 728 F.2d at 1086. The Court finds that the transfer of assets for little or no consideration weighs in favor of finding for the government.

## 4. Use of Trusts for Fraudulent Purposes

The next factor to consider is whether the trusts were used for fraudulent purposes. McKenzie transferred his assets to the MFT and Barbara McKenzie in 1993 and 1994, after he knew of his liability for unpaid taxes for the years 1984 through 1987. He has not made any payments since the government's assessments against him, has not paid fines from his criminal case, has not paid past due taxes, has failed to file income tax returns, and has failed to pay federal income taxes for years[18] since his criminal conviction for income tax evasion.

The Court finds that McKenzie placed assets into trusts for fraudulent purposes. Instead of using these assets to repay his tax liabilities, McKenzie transferred these assets to the MFT and his ex-wife, Barbara McKenzie. The Court notes that McKenzie admitted to a former business associate, Todd Mueller, that he placed assets in his children's names because of his problems with the IRS. He has also represented himself to others[19] as the owner of 24-7 Convenience Store and Dick's Auto Sales. McKenzie's actions in managing the assets of the MFT and MFRT, including signing Kristi Fleetwood's name and Barbara McKenzie's names to documents, is indicative of his fraudulent intent. The Court finds that McKenzie's use of the trust was for fraudulent purposes, and this weighs in favor of finding for the government.

## 5. Trust Formalities

Another factor weighing in the government's favor is that the MFT and MFRT failed

---

[18]McKenzie filed a 1993 Form 1040 in 1996. He failed to file tax returns during some of the years from 1993-2008 for income earned from rental properties. In 2009, he filed late tax returns for the tax years 1999-2001 and 2003-2007. The Court agrees with the government's assertion that, on these returns, he failed to fully report rent proceeds deposited in his personal bank accounts.

[19]For additional support, the government presented a brokerage account application made in May 2000, on which McKenzie represented that his total net worth was $500,000. The government contends that McKenzie's assets did not total $500,000, unless he considered the assets of the MFT and MFRT in his calculation of his net worth.

to conform with trust formalities.  The MFT did not file tax returns for the tax years 1996 through 2008, despite earning rental income from properties titled in its name.  For a 1993 tax return filed in 1996, the return was signed by Ms. Simons, who had not been the trustee for two years.  She also signed a lease agreement in 1996 for Parcel D.  The MFT also did not keep financial records, provide financial statements to Ms. Simons (as nominal settlor of the trust), or require signatures for disposing of MFT assets.  The foregoing examples collectively raise significant suggest the trusts were McKenzie's nominees or alter egos.

The Court looks to *In re Gillespie*, 269 B.R. 383, 389 (Bankr. E.D. Ark. 2001), where that court held that "the evidence is overwhelming" that the "trust functioned merely as an appendage" of the defendants.  The court continued,

> There was no respect for separate corporate or trust identities with regard to either assets or expenses.  Even the testimony before this court was similar to that quoted by the Eighth Circuit Court of Appeals in *Horton Dairy*: "it was just all the same money . . . .  It was just back and forth."  *Id.* at 289.  Similarly, as in *Horton Dairy*, the only evidence that the trust or corporate entities even existed were the documents which created them.  For all other purposes, the trust and corporations were virtually nonexistent.  There were no meetings of the officers or boards of the corporations, and assets-primarily cash-were freely transferred among the corporations for either business or personal purposes, without regard to any formalities or even thought as to the corporate or trust entities. . . . The trust formalities had no meaning to her.

*In re Gillespie*, 269 B.R. at 389.  Here, no evidence was presented that the MFT or MFRT complied with trust formalities, or attempted to keep trust identities separate with assets or expenses.  There was also testimony establishing that McKenzie's personal funds were also commingled with trust assets.  It is clear that McKenzie made no practical distinction between personal and trust property.

Also, the MFT holds title to Parcels A and B, upon which Dick's Auto Sales and 24-7 Convenience Store operate, respectively.  Dick's is nominally owned by Barbara McKenzie

and 24-7 Convenience Store is nominally owned by Kristi Fleetwood and Barbara McKenzie. No formal landlord-tenant relationship exists between the trust and the commercial properties.

After considering the totality of the circumstances, the Court finds that the McKenzie Family Trust and McKenzie Family Revocable Trust is McKenzie's nominee or alter ego. *See Horton Dairy, Inc.*, 986 F.2d at 290. As a result, McKenzie's unpaid tax liabilities and resulting tax liens for the years 1984 through 1987 attach to the assets nominally held by the MFT and MFRT. The Court authorizes the government to enforce its federal tax liens on Parcels A and B and to sell those properties for the purpose of paying McKenzie's outstanding tax liabilities for the years in question.

### C. Count III

The United States also asks the Court to aside McKenzie's transfer of Parcels C, D, E, and F. Because these parcels are located in Illinois, the Court applies Illinois's fraudulent conveyance statute to McKenzie's transfer, to determine if the transfers should be set aside.

It is undisputed that McKenzie transferred the parcels to the MFT in 1993, but the issue is whether he fraudulently transferred the parcels. The Illinois fraudulent transfer statute states, in relevant part, that a transfer by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made, if the debtor made the transfer:

> (1) with actual intend to hinder delay, or defraud any creditor of the debtor; or
> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor . . . (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

740 ILCS §§ 160/5. This "fraud in fact" or actual fraud occurs when a debtor transfers property with the intent to hinder, delay, or defraud his creditors. *Bay State Milling Co. v. Martin (In re Martin)*, 145 B.R. 933, 946 (Bankr. N.D. Ill. 1992), *appeal dismissed*, 151

B.R. 154 (N.D. Ill. 1993). The movant has the burden of proving all elements of actual fraud under Illinois law by clear and convincing evidence. *Grochocinski v. Knippen (In re Zeigerler)*, 355 B.R. 710, 732 (Bankr. N.D. Ill. 2006). Courts can consider several factors for determining whether actual intent to fraudulently convey existed, including:

> (1) the transfer or obligation was to an insider;
> (2) the debtor retained possession or control of the property transferred after the transfer;
> (3) the transfer or obligation was disclosed or concealed;
> (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
> (5) the transfer was of substantially all the debtor's assets;
> (6) the debtor absconded;
> (7) the debtor removed or concealed assets;
> (8) the value of the consideration received by the debtor was not reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
> (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
> (10) the transfer occurred shortly before or after a substantial debt was incurred; and
> (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

§ 160/5(b).

When the aforementioned "'badges of fraud' are present in sufficient number, it may give rise to an inference or presumption of fraud." *Steel Co. v. Morgan Marshall Indus., Inc.*, 662 N.E.2d 595, 602 (Ill. 1996). *See, e.g.*, *Berland v. Mussa (In re Mussa)*, 215 B.R. 158, 170 (Bankr. N.D. Ill. 1997) (seven badges of fraud are sufficient to raise a presumption of fraudulent intent). While a transfer between family members is not per se proof of fraudulent intent, a familial relationship is "weighty proof of such intent." *In re Roti*, 271 B.R. 281, 301, *aff'd*, 2003 WL 1089363 (Bankr. N.D. Ill. 2002) (citation omitted).

However, "fraud in law" does not require a showing of fraudulent intent. § 160/5(a)(2); *In re Phillips*, 379 B.R. 765, 778 (Bankr. N.D. Ill. 2007) (citing *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1079 (7th Cir. 1997)). The

difference between "fraud in fact" and "fraud in law" turns on whether there is any consideration for the conveyance at issue. § 160/5. Rather, "fraud is presumed if a debtor transfers property for less than adequate value and is thereby unable to meet his obligations," and such a conveyance is constructively fraudulent. *In re Phillips*, 379 B.R. at 778 (citing *Daley v. Chang (In re Joy Recovery Tech. Corp.*), 286 B.R. 54, 73 (Bankr., N.D. Ill. 2002)). The movant must prove fraud in law by a preponderance of the evidence. *Joy Recovery*, 286 B.R. at 73. The elements for a conveyance fraudulent in law are the following: (1) the debtor made a voluntary transfer; (2) at the time of the transfer, the debtor had incurred obligations elsewhere; (3) the debtors made the transfer without receiving a reasonably equivalent value in exchange for the transfer; and (4) after the transfer, the debtor failed to retain sufficient property to pay his indebtedness. *In re Gluth Bros. Const., Inc.*, 424 B.R. 368, 376 (Bankr. N.D. Ill. 2009). Under Illinois fraudulent conveyance law, there must be a voluntary transfer without consideration and the transfer must impair the rights of creditors to support a finding of fraud in law. *Tcherepnin v. Franz*, 457 F. Supp. 832, 836 (N.D. Ill. 1978).

Here, McKenzie's transfers of Parcels C, D, E, and F, were fraudulent under both the fraud in fact and fraud in law transfer theories. As to the fraud in fact, there are several "badges of fraud" present with McKenzie's transfer of the assets to the trust. *See Steel Co.*, 662 N.E.2d at 602. The transfer was to an "insider" because it was a trust McKenzie himself created; McKenzie retained possession or control of the property after the transfer; McKenzie knew of his tax liabilities before the transfer; the transfer was substantially all of McKenzie's assets; McKenzie made the transfers for little or no consideration; and the transfer occurred shortly before and after McKenzie's tax liability was incurred. § 160/5(b). This is clear and convincing evidence that McKenzie engaged in actual fraud. *See In re Mussa*, 215 B.R. at 170.

Further, McKenzie's transfer of these parcels was also fraud in law. There was little or no consideration for the transferred parcels, § 160/5(b), and "fraud is presumed" when

the property is transferred for less than "adequate value." *See In re Phillips*, 379 B.R. at 778. The elements of fraud in law are also satisfied here: McKenzie transferred the parcels voluntarily; McKenzie had incurred tax liabilities at the time of the transfer; McKenzie did not receive reasonably equivalent value for the transfer; and McKenzie failed to retain sufficient property to pay for his indebtedness after the transfer. *See In re Gluth Bros. Constr., Inc.*, 424 B.R. at 376. The Court finds by a preponderance of the evidence that McKenzie's transfer of the parcels was fraud in law.

Because the MFT has subsequently disposed of Parcels C, D, E, and F, the Court finds that the United States, in equity, is entitled to a judgment against the MFT in the amount of $253,885,[20] which is the sum of the fair market value of these parcels at the time of their disposal.

### D. Affirmative Defense of Laches

McKenzie, Ms. Fleetwood, and Barbara McKenzie urge the Court to find that the doctrine of laches bars the Court from entering judgment in favor of the government. The government argues that laches is inapplicable.

The doctrine of laches bars an action when there is "(1) unreasonable and unexcused delay, (2) resulting in prejudice to the defendant." *In re Sharpe*, 160 B.R. 614, 625 (Bankr. W.D. Mo. 1993) (citing *Whitfield v. Anheuser-Busch, Inc.*, 820 F.2d 243, 244 (8th Cir. 1987)). While a delay in enforcing a right is an element of the doctrine of laches, that alone does not constitute "laches." *Davenport Osteopathic Hosp. Ass'n of Davenport, Iowa v. Hosp. Serv., Inc., of Iowa*, 154 N.W.2d 153, 162 (Iowa 1967). Additionally, examples of prejudice that will support the defense of laches include loss of evidence in support of defendant's position or the unavailability of witnesses, *Whitfield*, 820 F.2d at 245–46, or when the delay has harmed claimant or caused material prejudice. *Chicago, R.I. & P.R. Co.*

---

[20]Parcels C and D each sold for $60,000, the assessed value of Parcel F in 1993 was $108,885, and a portion of Parcel E was sold for $25,000.

*v. City of Iowa City*, 288 N.W.2d 536, 541 (Iowa 1980). "The party asserting the defense has the burden to establish all the essential elements thereof by clear, convincing, and satisfactory evidence." *Zimmer v. Travelers Ins. Co.*, 454 F. Supp. 2d 839, 859 (S.D. Iowa 2006) (quoting *Garrett v. Huster*, 684 N.W.2d 250, 255 (Iowa 2004)).

Laches is inapplicable when the delay is occasioned by the party seeking to invoke the doctrine. *See Regal Ins. Co. v. Summit Guar. Corp.*, 324 N.W.2d 697, 704 (Iowa 1982). "To bar recovery on the basis of laches because of a defendant's own concealment or misrepresentation would unjustly pin the responsibility for delay on the wrong party." *Id.* (citing *Holden v. Constr. Mach. Co.*, 202 N.W.2d 348, 356 (Iowa 1972)). Also, a party cannot assert the defense of laches if he actually benefitted from the delay. *Markey v. Carney*, 705 N.W.2d 13, 23 (Iowa 2005). A court has discretion and should consider the circumstances of each case before applying the doctrine. *See Davidson v. Van Lengen*, 266 N.W.2d 436, 439 (Iowa 1978) (citation omitted).

Here, the Court finds that the doctrine of laches is inapplicable. While there was certainly delay in bringing this enforcement action, time, alone, is insufficient to support a laches claim. *See Davenport Osteopathic Hosp. Ass'n,* 154 N.W.2d at 162. The Court finds that McKenzie also aided in the delay when he fraudulently transferred nearly all of his assets in order to prevent enforcement. *See Regal Ins. Co.*, 324 N.W.2d at 704. McKenzie was not materially prejudiced by this delay, but rather, has enjoyed the use of these assets. *See Markey*, 705 N.W.2d at 23; *Chicago, R.I. & P.R. Co.,* 288 N.W.2d at 541. The Court considers the circumstances of this case and finds that McKenzie has not shown by clear and convincing evidence that the delay was unreasonable, or that he was materially prejudiced by the delay. *See Zimmer*, 454 F. Supp. 2d at 859.

## IV. CONCLUSION

Based on the foregoing findings of fact and conclusions of law, judgment shall be entered as follows:

(1)    With respect to Count I, the Court enters judgment against Charles McKenzie in the amount of $1,127,200.73. This is the unpaid balance of Form 1040 taxes and related interest and penalties for the periods 1984 to 1987, plus all penalties and interest accruing under law after June 13, 2008, pursuant to 26 U.S.C. §§ 6601, 6621, and 6622, and 28 U.S.C. § 1961(c) until paid.

(2)    With respect to Count II, the Court enters judgement in favor of the United States and declares that federal tax liens arising from Charles McKenzie's unpaid tax liabilities for the tax years 1984 through 1987 attach to Parcels A and B, which are held by the McKenzie Family Trust as Charles McKenzie's nominee or alter ego. This includes the buildings located on Parcels A and B.

(3)    The United States is also hereby authorized to enforce its federal tax liens on all of Charles McKenzie's property and rights to property, including Parcels A and B, and pursuant to further order of this Court, is authorized to arrange for the sale of Parcels A and B. The proceeds of Parcels A and B shall be used to pay the administrative costs associated with the sale, satisfy a mortgage held by Community State Bank that encumbers Parcel A, and all remaining proceeds shall be applied against Charles McKenzie's tax liabilities for the tax years 1984 through 1987,

(4)    With respect to Count III, Judgment shall be entered in favor of the United States and against the McKenzie Family Trust in the amount of $253,885, plus interest accruing under law.

**IT IS SO ORDERED**.

**DATED** this 17th day of February, 2011.

JOHN A. JARVEY
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF IOWA